**The below described is SIGNED.**



**Dated: February 08, 2007** _____

**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**

_____

_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

In re:

DEBRA JEAN HOLLING,

                Debtor.

———————————————————

STEPHEN RUPP, Trustee of the Chapter 7 bankruptcy estate of Debra Jean Holling,

                Plaintiff,

vs.

GEORGE HOLLING,

                Defendant.

Bankruptcy Number: 05-38322

Chapter 7

Adversary Proceeding Number: 06-2509

Judge Judith A. Boulden

## MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Before the Court is the Chapter 7 Trustee's (Trustee) Motion for Summary Judgment

(Motion) that requires the Court to determine whether the Defendant, George Holling

(Defendant), received a fraudulent transfer from his wife Debra Jean Holling (Debtor) under the

1

Utah Uniform Fraudulent Transfer Act (UFTA).  The Court has considered the facts properly

before it, the arguments presented by counsel, has conducted an independent review of applicable

law, and finds that notice was properly given to all parties in interest.  Based on the foregoing, the

Court issues the following decision.

## I.    JURISDICTION AND LEGAL STANDARD

This is a core proceeding under 28 U.S.C. § 157(b)(2)(H), and the Court may enter a final

order.  The Trustee has moved for summary judgment under Federal Rule of Bankruptcy

Procedure Rule 7056.  Rule 7056 makes summary judgment appropriate when, after

consideration of the record, the Court determines that "there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."[1]  In applying this

standard, the Court examines the factual record in the light most favorable to the nonmoving

party.[2]  There is no genuine issue of fact "[w]here the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party."[3]  The moving party has the burden of

establishing that it is entitled to summary judgment.

## II.    FACTS

The following facts are undisputed:

1.    The Defendant is the Debtor's spouse.

---

[1]    FED. R. BANKR. P. 7056, incorporating FEDERAL RULE OF CIVIL PROCEDURE 56(c).

[2]    *See Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

[3]    *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

2.      Sometime in 2000, the Defendant formed Rocky Mountain Technologies, Inc. (Rocky Mountain).  At that time, the Defendant was the sole owner of all the corporate stock of Rocky Mountain (Rocky Mountain Stock).

3.      Sometime in 2003, the Defendant transferred all of the Rocky Mountain Stock to the Debtor.  The transfer was made without consideration.

4.      As of January 1, 2004, the Rocky Mountain Stock was valued at $971,745 according to Rocky Mountain's 2004 federal income tax return.

5.      The value of the Rocky Mountain Stock listed on the 2004 federal income tax return arose almost entirely from an obligation owed to Rocky Mountain by either Corbin Motors or Advanced Motions Controls, Inc. (AMC) which debt was deemed uncollectible as of March 31, 2003 when Corbin Motors filed a bankruptcy petition.

6.      As of January 1, 2004, Rocky Mountain had a cash balance of $3,186 and other uncollected accounts receivable totaling approximately $80,901.

7.      In July 2004, the Debtor transferred all of her interest in the Rocky Mountain Stock back to the Defendant (Transfer).

8.      The Debtor received no consideration from the Defendant for the Transfer.

*9.     During the year prior to filing her bankruptcy petition, the Debtor had income of $800.00.[4]

*10.    During the year prior to filing her bankruptcy petition, the Debtor did not transfer any property absolutely or as security.

*11.    During the year prior to filing her bankruptcy petition, the Debtor did not close, sell or otherwise transfer any financial accounts.

*12.    As of the date of the Transfer the Debtor had liabilities of at least $15,100.95 in the form of two student loans.

13.     On June 3, 2004 the Debtor entered into a lease agreement (the "Lease Agreement") with LCI Enterprises, LLC (LCI).

---

[4]      Each statement of fact marked with * was taken from the Trustee's Statement of Facts to which the Defendant has not objected.

3

14.      The Lease Agreement was signed by the Debtor/d.b.a. the Skatin' Station, Inc. (Skatin' Station).

*15.      The Lease Agreement obligated the Debtor to make monthly lease payments of $4,339.00 for the months of June, July and August and monthly lease payments of $8,678.00 from September 2004 through May 2009.

*16.      From July 1, 2004 to September 30, 2004 the [Skatin' Station] had a net loss of $40,928.15.

*17.      On October 15, 2004 and November 8, 2004 the Debtor received small business loans from First Utah Bank and the Salt Lake City Corporation, respectively, totaling at least $177,892.44, to operate [t]he Skatin' Station.

*18.      In addition to the loans needed to operate the Skatin Station' . . . the Debtor/the Skatin' Station also received loans from [Rocky Mountain] and [the Defendant] totaling $365,000.00.

19.      The Debtor filed a petition for bankruptcy relief on October 13, 2005.

20.      As of the date of filing, the Debtor listed assets valued at $2,459 on her Schedules.

21.      As of the date of filing, the Debtor did not attribute any value on her Schedules to her interest in the Skatin Station.

22.      As of the date of filing, the Debtor listed secured debt of $177,892, priority debt of $23,100, and unsecured debt of $420,463 on her Schedules.

23.      The Trustee filed this adversary proceeding on October 3, 2006.

## III.  DISCUSSION

The Trustee has requested that this Court grant summary judgment on his first and second claims for relief seeking avoidance of the Debtor's Transfer of the Rocky Mountain Stock to the Defendant, and the third claim for relief seeking recovery of the value of the transferred asset.  As a threshold matter, the Court finds that this complaint was timely filed under Utah Code Ann. § 25-6-10 because the complaint was filed within four years of the alleged fraudulent transfer and the Transfer itself was made within 4 years of filing the complaint.

4

A.    Trustee's First Claim for Relief – Utah Code Ann. § 25-6-6

In order to succeed under Utah Code Ann. § 25-6-6(1) (under which the Trustee gains

certain rights to sue by 11 U.S.C. § 544), the Trustee must demonstrate: (1) that a transfer was

made; (2) that the debtor did not receive reasonably equivalent value; (3) that the debtor was

insolvent at the time of the transfer; and (4) that at the time of the transfer there was a creditor

whose claim arose before the transfer was made.  As to the first element, the undisputed facts

show that the Debtor transferred her 100% interest in the Rocky Mountain Stock to the

Defendant in July 2004.

The second element of the first claim for relief, whether the Debtor received reasonably

equivalent value, "is largely a question of fact, as to which considerable latitude must be allowed

to the trier of the facts"[5] and is an issue that the parties dispute.  Under Utah Code Ann. § 25-6-

4(1) "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation,

property is transferred . . . ."  The undisputed facts demonstrate that the Defendant gave nothing

of value to the Debtor in exchange for the Debtor's transfer of the Rocky Mountain Stock to the

Defendant.  The remaining question then is whether a transfer with no consideration constitutes

reasonably equivalent value because the Rocky Mountain Stock was also valueless.

The Trustee has asserted that the fair market value of the Rocky Mountain Stock at the

time of the Transfer was $971,745.  The Trustee bases this assertion on Rocky Mountain's 2004

federal tax return.  The Trustee also argues that even if the value of the Rocky Mountain Stock is

zero as the Defendant alleges, then there was still at least $3,186 in cash and other accounts

receivable owed to Rocky Mountain that would have given the stock some value at the time of

---

[5]    *In re Wes Dor, Inc.*, 996 F.2d 237, 242 (10th Cir. 1993) (internal quotations and citation omitted).

the Transfer, and an exchange of something ($3,186 cash and accounts receivable) for nothing

cannot be an exchange for reasonably equivalent value.  To rebut these allegations, the Defendant

has come forward with a preliminary expert report from E. Gail Anger (Anger), a Certified Public

Accountant, who concluded that "the stock in [Rocky Mountain] would have little, if any, value in

the hands of a party who had no engineering expertise" and that "the liability in favor of AMC,

which was ultimately assigned to [Rocky Mountain] had no value as of late July, 2004, when the

[Rocky Mountain Stock] was transferred to the Defendant.  This follows from one simple fact:

the liability became uncollectible by either AMC or [Rocky Mountain] as of March 31, 2003 . . ."[6]

Anger's preliminary report also indicates that the other accounts receivable totaling approximately

$80,901 were payable to the Defendant personally and not to Rocky Mountain leaving only the

$3,186 in cash which could have given any value to the Rocky Mountain Stock.

In a recently published opinion the Seventh Circuit stated that "'[t]he test used to

determine reasonably equivalent value in the context of a fraudulent conveyance requires the

[C]ourt to determine the value of what was transferred and to compare it to what was received.'"[7]

The Debtor transferred her 100% ownership in the Rocky Mountain Stock.  The Trustee has

come forward with evidence that the Rocky Mountain Stock had some value as of January 1,

2004.  The Defendant has attempted to rebut this assertion with Anger's preliminary report.  In so

doing, however, the Defendant has admitted that as of January 1, 2004 there was at least $3,186

in cash held by Rocky Mountain which would have given the stock some value.  There is no

---

[6]      Def.'s Mem. In Supp, Ex. A at 6.

[7]      *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.)*, 472 F.3d 943, 3 (7th Cir. 2007) (quoting *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir. 1997)).

material issue of disputed fact indicating that the cash was no longer an asset of Rocky Mountain

as of July 2004. As a result, the undisputed facts demonstrate that at the time of the Transfer the

Rocky Mountain Stock had **some** value. The undisputed facts also demonstrate that the

Defendant gave absolutely no consideration or value in exchange for the Transfer. Comparing the

value of what was transferred (100% ownership interest in an entity with cash of $3,186 on hand)

with the value of what was received (nothing of value), the Court reaches the conclusion that the

transfer was made for less than or no reasonably equivalent value.[8]

The third element of the Trustee's first claim for relief, whether the Debtor was insolvent

or became insolvent as a result of the Transfer, is also disputed. But it is the applicable insolvency

test that the parties dispute rather than the facts surrounding the issue of insolvency. After

questioning both parties about which test should be applied, the Court granted the parties the

opportunity to file supplemental briefs on the issue which they did. In the supplemental brief, the

Defendant agreed that the appropriate approach to determine insolvency is the balancing test

which is set forth in Utah Code Ann. § 25-6-3. That section of the Utah Code provides that "[a]

debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair

valuation."[9]

A review of the Debtor's Statement of Financial Affairs and Schedules shows that the

Debtor's liabilities as of the date of filing (October 13, 2005) exceeded her assets. These

---

[9]     Subsection (2) of UTAH CODE ANN. § 25-6-3 states that "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." This section of the UFTA establishes a presumption that a debtor is insolvent if she is not paying her debts as they become due. It does not, however, establish the inverse that a debtor who is paying her debts as they come due is presumed solvent.

documents also show that she made no transfers and acquired no new assets in the year prior

(October 13, 2004) to filing her petition for bankruptcy relief.

The Defendant argues, however, that the Court cannot determine whether the Debtor was

insolvent at the time of the Transfer without considering the fair market value of the Skatin'

Station at the time of the Transfer and that any finding regarding such valuation must be based

upon the testimony of an expert.  But contrary to the Defendant's assertion that expert testimony

is the only way to determine value, the following undisputed facts about the Skatin' Station have

been disclosed to the Court upon which it may rely in making such a determination.  The Skatin'

Station operated at a net loss of $40,928.15 from July 1, 2004 to September 30, 2004.

Thereafter, First Utah Bank and Salt Lake City Corporation made loans to the Skatin' Station in

October and November of 2004, three or so months after the Transfer.  The Defendant and Rocky

Mountain also made loans to the Skatin' Station throughout 2004 and 2005.  Thus, the

undisputed evidence indicates that the Skatin' Station's debt increased by the amount of these

loans.  The Court will assume that these loans infused money into the Skatin' Station, but there is

no evidence as to how the funds were used or if the funds also increased the Skatin' Station's

assets.  The money could have been consumed by operating expenses, or it could have been used

to purchase assets such as inventory, equipment or the like.  The Defendant has failed to come

forward with any evidence that the Skatin' Station acquired assets to offset the loan liabilities,

therefore, the Court may reasonably conclude that the loans did not increase the value of the

Skatin' Station.  It is also undisputed that at the time of the Transfer, the Debtor had entered into

the Lease Agreement with LCI placing significant liabilities on the Debtor personally as well as

the Skatin' Station.

8

Although there is no expert testimony regarding the fair market value of the Skatin'

Station, there are undisputed facts that indicate, as ultimately evidenced by the Debtor's failure to

attribute any value to the Skatin' Station on her Schedules, that the Skatin' Station did not

increase the Debtor's net worth.  The undisputed facts merely show that the Skatin' Station was

another of the Debtor's liabilities, and the Defendant has not come forward with any evidence to

rebut these facts.  It is, therefore, the Court's conclusion that the Debtor's liabilities

exceeded the fair value of her assets at the time of the Transfer.

The final element under Utah Code Ann. § 25-6-6(1) is that at the time of the transfer, the

debtor had at least one creditor.  The Trustee asserts that LCI was a creditor at the time of the

Transfer.  In June 2004, the Debtor executed the Lease Agreement with LCI in anticipation of

opening the Skatin' Station.  The Lease Agreement required the Skatin' Station to make

payments of $4,339 for June, July, and August of 2004 and monthly lease payments of $8,678

from September 2004 through May 2009.  The Lease Agreement also provided that "[a]ll

obligations in this lease are deemed to arise from and after the Order of Relief in a voluntary or

involuntary petition in bankruptcy."[10]  It is the Defendant's position that in the event the Debtor

filed for bankruptcy, LCI's claim against the Skatin' Station (and by personal guarantee, against

the Debtor) would not arise until the order for relief was entered.  If this provision of the Lease

Agreement is valid and enforceable, the Trustee's argument that LCI was a creditor at the time of

the Transfer fails.

The Trustee counters arguing that § 365(e)(1) prohibits this attempt at contractually

defining when claims arise for the purpose of bankruptcy.  Section 365(e)(1) of the Code is

---

[10]       Trustee's Memo. In Supp., Ex. 5 at ¶ 19.

9

consistently used to defeat termination-upon-bankruptcy clauses and other *ipso facto* clauses in

contracts "which permit one contracting party to terminate or even modify an executory contract

or unexpired lease in the event of bankruptcy of the other contracting party."[11]  This particular

section of the Code is applicable to the facts of this case because the Lease Agreement contains an

*ipso facto* clause.  It allows the Lease Agreement to be modified if one party files bankruptcy.

Such a provision is unenforceable under § 365(e)(1).  There is also a general sense that the Code

"pre-empts the private right to contract around its essential provisions . . . ."[12]  Establishing

whether a claim arises before or after filing is an essential provision of the Code in determining the

rights of both creditors and the debtor.[13]  It is inappropriate and against public policy to allow the

Debtor and LCI to contract away the essential provisions of the Code.  For these reasons, the

Defendant's attempt to establish that the Debtor did not have a creditor at the time of the Transfer

under the terms of the Lease Agreement fails.

Having resolved the contract issue, this Court must determine if LCI was a creditor at the

time of the Transfer.  Utah Code Ann. § 25-6-2(4), which again is applicable under § 544 of the

---

[11]      *Lyons Sav. and Loan Ass'n, v. Westside Bankcorporation, Inc.,* 828 F.2d 387, 393 n.6
(7th Cir. 1987).

[12]      *In re Pease*, 195 B.R. 431, 425 (Bankr. D. Neb 1996) (invalidating agreement between
debtor and creditor under which parties agreed prepetition to termination of the automatic stay upon filing);
*see also In re Shady Grove Tech Ctr. Assocs. Ltd. Partnership,* 216 B.R. 386, 390 (Bankr. D. Md. 1998)
("This court holds that prohibitions against the filing of a bankruptcy case are unenforceable, self-
executing clauses in pre-petition agreements purporting to provide that no automatic stay arises in a
bankruptcy case are contrary to law and hence unenforceable, and that self-executing clauses in pre-
petition agreements that purport to vacate the automatic stay are likewise unenforceable."); *Chilcoat v.
Minor (In re Minor)*, 115 B.R. 690, 694-96 (D. Colo. 1990) (a prepetition waiver of a bankruptcy
discharge is invalid unless the waiver complies with other provisions of the Code).

[13]      *See e.g.* § 101(10) (definition of creditor); § 362 (automatic stay); § 365
(assumption/rejection of executory contracts); § 501 (who may file a proof of claim); § 506 (claim
allowance).

Code, defines a creditor as a person who has a claim.  Subsection (3) defines a claim as "a right to

payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."[14]

The undisputed facts show that under the terms of the Lease Agreement, the Debtor was

obligated to make lease payments to LCI beginning in June 2004.  In exchange for allowing the

Debtor's company to occupy the building, LCI received the right to lease payments each month.

These undisputed facts show that LCI had a claim or a right to payment at the time of the

Transfer in July 2004.  Consequently, the Court finds that there was a creditor in existence at the

time of the Transfer.

## IV.   CONCLUSION

Each element of Utah Code Ann. § 25-6-6(1) has been established by the undisputed facts.

As a result, the Court finds that the Trustee is entitled to summary judgment on his first claim for

relief.  Because the Trustee is entitled to relief on his first claim for relief, it is not necessary for

the Court to address the elements of the Trustee's second claim for relief under Utah Code Ann.

§25-6-5.  The only issue remaining is the value of the Rocky Mountain Stock at the time of the

Transfer for the purpose of calculating damages and establishing the amount of the recovery on

the Trustee's third claim for relief.  The parties will proceed to trial on this issue.  The Court will

issue a separate judgment consistent with this Memorandum Decision.

---------------------------------------------END OF DOCUMENT----------------------------------------

---

[14]      UTAH CODE ANN. § 25-6-2(3).

_____oOo0oOo_____

SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION GRANTING TRUSTEE'S**

**MOTION FOR SUMMARY JUDGMENT** will be effected through the Bankruptcy Noticing

Center to each party listed below.

James C. Haskins
Thomas N. Thompson
Haskins & Associates
357 South 200 East
Suite 300
Salt Lake City, UT 84111
    *Counsel for the Defendant*

Jeremy C. Sink
McKay Burton & Thurman
170 South Main Street
Suite 800
Salt Lake City, UT 84101
    *Counsel for the Trustee*